1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT TACOMA

10   MICHELLE M. O'HARRA,
                                              CASE NO.     C08-5526RBL-KLS
11                    Plaintiff,
                                              REPORT AND
12        v.                                  RECOMMENDATION

13   MICHAEL J. ASTRUE, Commissioner of       Noted for May 22, 2009
     Social Security,
14
                      Defendant.
15

16

17

18

19        Plaintiff, Michelle M. O'Harra, has brought this matter for judicial review of the denial of her

20   application for supplemental security income ("SSI") benefits.  This matter has been referred to the

21   undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as

22   authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties'

23   briefs and the remaining record, the undersigned submits the following Report and Recommendation for

24   the Court's review.

25                          FACTUAL AND PROCEDURAL HISTORY

26        Plaintiff currently is 42 years old.[1]  Tr. 24.  She has a high school education, two years of college

27   _____

28        [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

education and past work experience as a waitress, bartender, cashier, janitor, and landscape laborer. Tr. 21, 104, 122, 130, 135.

On May 16, 2005, plaintiff protectively filed an application for SSI benefits, alleging disability as of June 1, 1990, due to a bipolar disorder, depression, problems with her back, knees and right shoulder, and allergies. Tr. 12, 88, 103. Her application was denied initially and on reconsideration. Tr. 24-25, 61, 66. A hearing was held before an administrative law judge ("ALJ") on December 6, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 347-71. At the hearing, plaintiff amended her alleged onset date of disability to May 16, 2005. Tr. 12, 349-50.

On March 21, 2008, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of disability;

(2) at step two, plaintiff had "severe" impairments consisting of attention deficit hyperactivity disorder ("ADHD"), a bipolar disorder and alcohol abuse;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) after step three but before step four, plaintiff had the functional capacity to perform a full range of work at all exertional levels, with certain non-exertional limitations;

(5) at step four, plaintiff had no past relevant work; and

(6) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 12-23. Plaintiff's request for review was denied by the Appeals Council on June 27, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R. § 416.1481.

On August 29, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on November 24, 2008. (Dkt. #13). Plaintiff argues the ALJ's decision should be reversed and remanded for further administrative proceedings for the following reasons:

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(a) the ALJ erred in failing to find plaintiff's physical problems were not severe, without further developing the record;

(b) the ALJ erred in evaluating plaintiff's mental impairment;

(c) the ALJ erred in assessing plaintiff's credibility; and

(d) the ALJ erred in assessing plaintiff's residual functional capacity.

For the reasons set forth below, the undersigned does not agree the ALJ erred in determining plaintiff to be not disabled, and therefore recommends the ALJ's decision be affirmed. Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ Properly Evaluated Plaintiff's Alleged Physical Problems

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." Id. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff had severe impairments consisting of ADHD, a bipolar disorder and alcohol abuse. Tr. 14. Plaintiff argues the ALJ erred in finding none of her alleged physical impairments to be severe as well. The undersigned disagrees. With respect to those alleged impairments, the ALJ found in relevant part as follows:

> The claimant is . . . obese and has alleged disability due to physical impairments including degenerative disc disease of the cervical spine and chronic pain in her back, knees and right shoulder as residuals of motor vehicle accidents (Exhibits B-3E/2 and B-20E). At the hearing she testified she will not perform work in her field of horticulture because of low back pain. However, the evidence of record suggests that the claimant has no physical limitation which results in more than minimal limitations in her ability to engage in work-related activities.
>
> The claimant has reported a history of surgery to her left knee in 1992 for repair of a torn ligament followed by physical therapy. She also reported a history of motor vehicle accidents in January 2000, January 2001 and December 31, 2004 (Exhibits B-16E/4 and B-1F/4). Chiropractic treatment records dated January 12, 2000, reveal an assessment of acute cervical, thoracic, and lumbar spine sprain/strain/subluxation and myospasm (Exhibit B-1F/6). In July 2005, Disability Determination Services medical consultants noted that although the claimant had alleged that back, knee and shoulder problems and allergies contributed to her disability, she had not seen a doctor for such complaints since 2002 (Exhibits B-2F and B-6F). Although she reported a history of physical injuries to Gale Smolen, M.D., during a consultative psychiatric evaluation performed in June 2005, she reported no associated limitations resulting from those injuries (Exhibit B-3/F2). Her complaints of physical limitations are also not consistent with her reported ability to perform self-care activities independently, perform household chores, provide care for her son, and keep appointments (Exhibit B-3F/2-3). DDS medical consultants concluded that the claimant has no physical impairment which is severe (Exhibit B-6F and B-8F).
>
> Updated medical records not available to the State agency medical consultants reveal only minimal treatment for physical impairments. The claimant sought treatment on February 8, 2007, for her annual gynecological examination. She also reported she had hepatitis C and requested liver functioning testing. At that time she did not complain of musculoskeletal pain and she demonstrated normal neurologic and musculoskeletal examinations with normal range of motion and strength, no joint enlargement or tenderness, normal reflexes and intact sensation (Exhibit B-15F/8). She returned on April 6, 2007, for medication check because she had begun treatment with lithium three days previously (Exhibit B-15F/3). Physical examination was normal and she was noted to be in no acute distress (Exhibit B-15F/4). On April 25, 2007, the claimant complained of pain in her shoulders and left thigh after lifting two buckets of water. She was prescribed Viodin for thoracic back strain. She was also diagnosed with bursitis not otherwise specified, and injected with lidocaine, Marcaine, and triamcinolone in the left subtrochanteric bursa (Exhibit B-15F/1). There is no indication the claimant returned for further treatment until August 29, 2007, when she complained of back pain after falling at home. She was prescribed Vicodin for thoracic back strain and referred for physical therapy (Exhibit B-16F/7-10). Physical examination performed on September 24, 2007, by physical therapist Chric Garcia, P.T., was generally normal other than some reduction in cervical range of motion

accompanied by upper thoracic and right-sided neck pain (Exhibit B-16/8).

At a height of 65 inches, the claimant's weight has been reported in the range of 170 to 191 pounds. However, there is no indication that her mild obesity has resulted in any additional and cumulative effects in combination with her musculoskeletal impairments as contributing to overall disability. . . .

I find the claimant's hepatitis C also represents a non-severe impairment. Medical records reveal the claimant has been asymptomatic. There is no evidence of end-stage organ damage or that her hepatitis has resulted in any limitation in her physical functioning. Although laboratory testing revealed elevated liver enzymes in 2007 (Exhibits B-15/11, 17 and B-16F/12), she admitted at the hearing that her alcohol abuse contributes to decreased liver function. It has also been reported that prescribed lithium can also contribute to elevated liver enzymes.

Tr. 15-16. The undersigned finds the ALJ's step two determination here to be supported by the substantial evidence in the record.

In challenging that determination, plaintiff relies primarily on her own self-reports concerning her alleged pain and other physical symptoms. Specifically, plaintiff asserts she had reported being unable to perform her past work in horticulture, having difficulty sitting and standing for long periods of time, and being limited in her ability to perform household chores, all due to pain. She also points to the observation of a Social Security Administration employee that she could not sit long during an interview that occurred in May 2005. At step two of the sequential disability evaluation process, though, while the ALJ must take into account a claimant's pain and other symptoms (see 20 C.F.R. § 404.1529), the severity determination is made solely on the basis of the objective medical evidence in the record:

A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities. If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added). Plaintiff points to no – and the undersigned cannot find any – objective medical evidence in the record to contradict the ALJ's findings at this step.

Plaintiff further asserts she reported having received treatment and been evaluated for her pain and other physical problems. But mere diagnosis of an impairment, or receipt of treatment therefor, do not in themselves establish the presence of significant work-related limitations, let alone disability. See Matthews

1   v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of

2   a disability").  Plaintiff also points to a late September 2007 progress note, in which her physical therapist

3   felt that the discomfort from her pain and loss of cervical mobility might be contributing to her "difficulty

4   maintaining steady employment." Tr. 301.  The ALJ correctly noted, however, that her physical findings at

5   the time were "generally normal." Tr. 16; see Batson, 359 F.3d at 1195 (treating physician opinion need

6   not be accepted if inadequately supported by clinical findings); see also Bayliss v. Barnhart, 427 F.3d

7   1211, 1216 (9th Cir. 2005) (discrepancies between medical source's functional assessment and his or her

8   clinical notes, observations and other comments concerning claimant's capabilities is clear and convincing

9   reason for not relying on that assessment); Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989).

10      Lastly, plaintiff argues the ALJ should have further developed the record concerning her physical

11  impairments and limitations, by requesting treatment records from Larry Bassinger, M.D., her primary care

12  practitioner.  The duty to further develop the record, however, "is triggered only when there is ambiguous

13  evidence or when the record is inadequate to allow for proper evaluation" thereof. Mayes v. Massanari,

14  276 F.3d 453, 459 (9th Cir. 2001).  Such is not the case here.  That is, plaintiff has not shown the evidence

15  in the record is ambiguous or forms an inadequate basis upon which the ALJ could find none of her

16  physical impairments were severe.  That is, the mere possibility that there may be additional records in

17  existence out there – although, again, plaintiff has not shown any such records do exist – and that those

18  records might in some way indicate the presence of significant work-related limitations – which, once

19  more, plaintiff has not made any showing in regard thereto – does not create the requisite ambiguity in the

20  evidence or inadequacy in the record required to trigger the above duty.

21  II.    The ALJ Did Not Err in Evaluating Plaintiff's Mental Impairment

22          A.    Plaintiff's Counseling Notes

23      Plaintiff argues the ALJ failed to fairly evaluate the impact of her mental impairments.  She asserts,

24  for example, that because she received mental health counseling at two different agencies, remand for the

25  purpose of obtaining progress notes resulting from that counseling is required, as those notes "could shed

26  light on her daily symptoms." (Dkt. #17, p. 25).  But this request for remand, as with her claim that the

27  ALJ should have further developed the record concerning her alleged physical problems, is without merit,

28  since plaintiff has failed to demonstrate the existence of any such notes, let alone the likelihood that those

notes will demonstrate the presence of more significant work-related mental functional limitations than already are established by the evidence currently in the record.

B.  Dr. Smolen

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

Plaintiff argues the ALJ failed to give specific and legitimate reasons for rejecting the opinion of Gail Smolen, M.D., an examining psychiatrist, that she could not get along with people due to her "mental illness." Tr. 207. The ALJ rejected this opinion, stating that although plaintiff "clearly" had "some deficits in work-related social functioning," Dr. Smolen's evaluation report did "not contain any evidence of that degree of limitation." Tr. 19. This, as noted above, is a valid reason for rejecting a medical source's opinion. <u>See</u> <u>Batson</u>, 359 F.3d at 1195; <u>Bayliss</u>, 427 F.3d at 1216; <u>Weetman</u>, 877 F.2d at 23. As evidence of such limitation, plaintiff asserts Dr. Smolen made observations indicating she would be incapable of any work-related social functioning and reviewed evaluations of her mental health counseling, which revealed she exhibited symptoms and engaged in behavior that would impact such functioning.

The only observation of Dr. Smolen points to, though, is that plaintiff did "a substantial amount of crying" in the interview. Tr. 206. But this does not necessarily establish any limitation in plaintiff's ability to function socially. That is, there is no indication that plaintiff's crying was an indication of work-related social functioning, rather than a symptom of what she was relating during the evaluation, or a symptom of depression apart from how plaintiff interacts with others. Indeed, Dr. Smolen made no express connection between plaintiff's crying and her opinion regarding plaintiff's inability to get along with other people, nor did Dr. Smolen explain what aspect or aspects of plaintiff's mental impairments she determined resulted in such an inability. The undersigned further notes that neither the mental status examination performed by Dr. Smolen nor any of Dr. Smolen's other clinical findings, give any indication of significant restrictions in plaintiff's social functioning. <u>See</u> Tr. 204-07.

As for Dr. Smolen's notations regarding plaintiff's mental health counseling records, nothing in Dr. Smolen's evaluation report indicates she relied on anything specific from those records in finding plaintiff unable to relate to other people. The mental health records themselves, furthermore, do not establish such a limitation. Plaintiff points to a progress note wherein she is noted to have fast and pressured speech as

well as a labile mood, which, she argues, certainly could impact her social functioning on the job. There is no evidence in the record, though, that those symptoms actually would cause such an impact. The same is true in regard to other comments made in which plaintiff was observed to have lability, irritability, racing thoughts, flight of ideas, and defensiveness. Although it may be that defensiveness was thought to possibly stem from plaintiff's reported lack of success in social situations, to the extent this is true, it still does not support an opinion that she is totally unable to relate to other people, even if Dr. Smolen could be said to have considered that comment from her mental health counselor.

Plaintiff, in addition, argues that her mental health counseling records show the difficulties she has had, which would impact her social functioning in the workplace. The undersigned, however, finds those reported difficulties to have been adequately accounted for by the ALJ's assessment of her mental residual functional capacity ("RFC"), which restricted her to work involving "only occasional contact with co-workers and no contact with the public." Tr. 17. First, the fact that plaintiff may experience "extremes" in manic and/or depressive moods does not, as argued by plaintiff, by itself establish that she has significant limitations in the area of social functioning – or, at least, limitations that are more severe than those found by the ALJ in his RFC assessment – without some specific evidence, as discussed above, of actual work-related functional limitations stemming therefrom. Thus, for example, while one treatment provider stated that she exhibited "pressure to talk regardless of appropriate social norms or her own wishes," plaintiff has not shown this would result in an inability to interact with others. See Tr. 309.

One mental health treatment provider stated as well that plaintiff's symptoms of attention deficit disorder ("ADD") were "causing clinically significant impairment in social, occupational, and relational functioning" (Tr. 229, 239), but no definition of "significant" was provided, nor is there any indication, once more, that it is more significant than what has been found by the ALJ. Indeed, other than the above comments, no further specific or more severe restrictions in social functioning were found or opined to by any of plaintiff's mental health treatment providers. See, e.g., Tr. 228-36, 239, 242, 244-56, 258, 262, 264-65, 270-75, 309-17, 321. Other objective medical evidence in the record further supports the limitations on social functioning found by the ALJ. For example, in late July 2005, based on a review of the evidence in the record, plaintiff was found by a non-examining psychologist to have only moderate difficulties in social functioning. Tr. 219, 224; see also Lester, 81 F.3d at 830-31 (non-examining physician's opinion

may constitute substantial evidence if consistent with other independent evidence in record); <u>Tonapetyan</u>, 242 F.3d at 1149 (same).

### C.  <u>Plaintiff's Insight and Judgment</u>

Plaintiff argues the ALJ erred by making several "unsupported assertions" in support of his finding that she was functioning well enough to work. (Dkt. #17, p. 27).  Specifically, plaintiff asserts that while the ALJ stated her insight and judgment had been deemed to be good, the medical evidence in the record shows this to have been the case only once.  The record, however, does contain more than once instance in which plaintiff's insight and/or judgment were noted to be good, or at least intact. <u>See</u> Tr. 206, 228, 248-49, 251.  There also are notations of at least "fair" insight and/or judgment, with no indication that such assessment indicates anything less than at least adequate functioning in those areas. <u>See</u> Tr. 230, 235, 239, 250, 253, 273, 310.

Although there are notations of less than fair or good insight and/or judgment at times as well (<u>see</u> Tr. 206, 235, 250, 273, 310, 312, 316), as indicated above, the majority of such notations rated plaintiff's insight and/or judgment to have been at least fair, and on several occasions good.  Thus, the undersigned does not find the ALJ necessarily erred here in stating that such areas of functioning "have been deemed good," since this technically is true. Tr. 19.  To the extent the ALJ may have inaccurately characterized the above evidence by so stating, the undersigned also finds any such error stemming therefrom to be harmless. <u>See</u> <u>Stout v. Commissioner, Social Security Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).  That is, plaintiff has not shown that a description of her insight and/or judgment as being less than good or fair would have been more accurate here, nor has she demonstrated that the ALJ in this case would have ruled differently, had such an alternate description thereof been adopted by him.

### D.  <u>Control of Plaintiff's Mental Impairment Symptoms</u>

Plaintiff next argues the ALJ erred in stating that mental health treatment records revealed that her symptoms could "be controlled with medication," asserting this statement is not supported by the evidence in the record. Tr. 19.  Specifically, plaintiff argues that no treatment provider has opined that her symptoms are under control, and she points to a recent statement by William Richert, M.A., one of her mental health counselors, in which he indicated that she was "not stable." Tr. 309.  The mere fact that no

medical source in the record has so opined, however, does not necessarily mean plaintiff's symptoms cannot be or are not controlled by medication. Indeed, the undersigned finds the substantial objective medical evidence in the record supports the ALJ's findings here.

It is true that the record does indicate that maintaining stability has remained an issue for plaintiff. See Tr. 207, 229, 233, 235, 239, 242, 250, 253, 265, 272-73, 309, 314. As further noted by the ALJ, though, the record also shows that plaintiff "has not consistently taken her prescribed medications," and that she has not been entirely consistent with pursuing her mental health counseling. Tr. 19-20, 205, 250-52, 275. In addition, substantial evidence in the record establishes that plaintiff's instability largely has coincided with her treatment noncompliance or being off of medications for her mental health symptoms, and that when she has complied with such treatment, those symptoms for the most part have subsided. Tr. 228, 233, 242, 244-45, 248-54, 265, 270, 272, 312, 314, 321.

Plaintiff asserts there is no evidence from her treatment providers that she has not been taking her medications as prescribed. But clearly this is not the case, as the record contains a number of examples of plaintiff not following through with recommended treatment. In late June 2005, for example, it was noted that plaintiff had "no showed" three times since beginning mental health counseling in early April 2005. Tr. 205. In early August 2005, plaintiff was reported to have "missed four of the last five" mental health counseling sessions, and was told that this "clearly" was "bad practice," and that if she missed another appointment, she would be referred "back to her primary care practitioner." Tr. 252. In mid-August 2005, it seems she was taking a sub-optimal dose of medication. Tr. 251.

Plaintiff was noted to have stopped taking that medication on her own in late August 2005, despite it being beneficial even at the low dose, and which resulted in an increase in her symptoms. Tr. 250. Her mental health counselor reported that she did "not seem to be willing to stick with the medication regime," that it was important to hold her "firm" to trying to make it work "or at least giving it a good try," which she had "not done yet." Id. In early December 2005, plaintiff was noted to be "inconsistent in attending therapy appointments" to such an extent that it was felt the "[e]ffectiveness of therapy was not measurably more than one would expect without treatment." Tr. 245. In mid-December 2006, one of her mental health counselors stated that a treatment plan was not completed, because she "did not have any sessions with the therapist." Tr. 275.

In late January 2007, plaintiff stated that she was "not currently on any medication to manage her bipolar or panic symptoms," and although she further stated that she had planned "to make an appointment with her new PCP by the end of the week so that she" could "resume medication" (Tr. 265), she provided no indication as to why she stopped it in the first place. While there is evidence that at times plaintiff has gone without treatment due to financial or other reasons (see Tr. 270, 272, 316), as noted above, there have been a number of other times this appears to have occurred for no other reason than because she has not complied with the recommendations of her mental health treatment providers. Accordingly, it does seem to be the case that consistent mental health treatment would control – and, indeed, as the record shows, has controlled – plaintiff's impairment-related symptoms.

E.    Plaintiff's Work Performance

Lastly, plaintiff argues the ALJ erred in discounting her "alleged inability to sustain work activity because of disabling impairments," in part on the basis that she "demonstrated an ability to perform some types of work despite her impairments." Tr. 20. Specifically, plaintiff asserts this finding is not supported by the ALJ's additional finding that she has no past relevant work, because none of it was performed at the substantial gainful activity level. But work need not be performed at the substantial gainful activity level for it to constitute evidence of a lack of credibility regarding alleged disabling symptoms. The undersigned does find, though, that the ALJ's general statement, without specific reference to portions of the record or examples of work performed, to be inadequate here. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (to reject claimant's subjective complaints, ALJ must provide specific, cogent reasons); see also Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988) (insufficient to reject medical opinion by merely stating, without more, there is lack of objective medical findings in record to support it). Nevertheless, as explained below, the ALJ did give other sufficiently valid reasons for discounting plaintiff's credibility.

III.    The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

1   long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148

2   (9th Cir. 2001).

3          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

4   the disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

5   identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>;

6   <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

7   malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

8   <u>Lester</u>, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. <u>O'Donnell v.</u>

9   <u>Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003).

10          In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

11  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

12  testimony that "appears less than candid." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

13  also may consider a claimant's work record and observations of physicians and other third parties

14  regarding the nature, onset, duration, and frequency of symptoms. <u>Id.</u>

15          The ALJ in this case discounted plaintiff's credibility in part for the following reason:

16          The claimant's credibility is reduced by the opinion of examining psychiatrist Gale
        Smolen, M.D., that the claimant had not been forthcoming regarding her reports of the
17      extent of her alcohol abuse. (Exhibit B-3F).  Dr. Smolen reported in June 2005 that
        although the claimant reported she had never had a problems [sic] with alcohol abuse,
18      medical records revealed the claimant had reported drinking 20 ounces of beer daily
        because it calmed her down. (Exhibit B-3F/2 and B-7F/7).  In August 2005, the
19      claimant reported drinking 40-80 ounces of alcohol a day (Exhibit 11F/9).

20  Tr. 19.  Plaintiff argues this is not a valid reason for discounting her credibility, because this was the only

21  occasion on which she asserts she failed to be fully truthful regarding her alcohol use.  All other medical

22  reports in the record, she further asserts, document without fail such use.  But plaintiff misses the point.

23  As noted above, the ALJ may consider "ordinary techniques of credibility evaluation," including

24  testimony, or in this case statements, which appear "less than candid."  Indeed, plaintiff's false or

25  misleading report to Dr. Smolen itself constitutes evidence of untruthfulness – and, notably, Dr. Smolen

26  herself commented that she was not reliable in the area of substance abuse (Tr. 204) – regardless of other

27  statements that may have been made to other treatment providers in the record.

28          Evidence that plaintiff has not been completely truthful regarding her alcohol use appears

elsewhere in the record as well.  For example, in early April 2005, plaintiff reported drinking "one quart of beer per day x 2 years" (Tr. 239) again in contrast to her telling Dr. Smolen just two months later that she had never had any problems with alcohol.  In late May 2005, plaintiff stated that she sometimes drank more than this. Tr. 231.  In early September 2006, plaintiff again reported that alcohol use had "never presented a problem for her," despite her acknowledgment that there had been "some concern" with respect to "possible current misuse of alcohol," and the earlier reports noted above. Tr. 254.

As noted by the ALJ, in mid-August 2005, plaintiff acknowledged "drinking 40 to 80 ounces of alcoholic beverage daily." Tr. 251.  In early September 2005, she reported "drinking about 12 to 24 ounces of beer on a daily basis." Tr. 249.  Plaintiff notes that this evidence does not demonstrate lack of candor on her part, because she testified at the hearing that she had not drunk alcohol on a daily basis since that time. Tr. 361.  In late April 2007, however, plaintiff reported that while she probably drank "3 times per month," lately she had been drinking alcohol at a rate of "maybe having 1 beer per day." Tr. 316.  This report too then calls into further question plaintiff's truthfulness on this issue.  Accordingly, the undersigned finds the ALJ did not err in discounting her credibility in part on this basis.

As discussed above, the ALJ discounted plaintiff's credibility as well in part on the basis that she had "not been fully compliant with treatment recommendations," and that her mental health treatment records revealed her symptoms could be "controlled with medication." Tr. 19.  Also as discussed above, the undersigned found no error on the part of the ALJ here.  In addition, the ALJ found plaintiff herself had testified at the hearing that she "experienced improvement in her symptoms with prescribed" medication. Tr. 19, 358.  These are valid reasons for discounting a claimant's credibility. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert good reason for not following prescribed course of treatment can cast doubt on sincerity of claimant's pain testimony); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of medical improvement); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

Plaintiff argues there is no evidence in the record that her failure to follow recommended treatment was volitional, thereby adversely affecting her credibility, rather than it being a consequence of her bipolar symptoms, in particular her mood swings.  But, as discussed previously, there is evidence that plaintiff has been non-compliant with recommended treatment, with at least some of her treatment providers expressing

frustration with her failure to comply therewith. To the extent that there is some contradictory evidence in the record concerning the actual reasons for why plaintiff failed to follow through here, the Court may not second guess the ALJ's determination, as questions of credibility are solely within the control of the ALJ. See Sample, 694 F.2d at 642; Allen, 749 F.2d at 579-80.

The ALJ, furthermore, provided other reasons for discounting plaintiff's credibility, which plaintiff has not challenged, and which the undersigned finds valid. For example, the ALJ pointed out that despite a "two-year course of study in agriculture and horticulture" and an "AA degree," plaintiff's "earnings record" reflected "a poor work history." Tr. 20; see Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly found poor work history and lack of propensity to work in lifetime negatively affected claimant's credibility regarding her inability to work). The ALJ also found plaintiff's credibility to have been reduced because of "a significant criminal history," including "convictions for Theft II and passing bad checks." Tr. 20, 204, 231, 239, 249. While the mere fact that a claimant has a criminal history, has been convicted of a felony, or has been incarcerated (see Tr. 20) does not necessarily reflect poorly on a claimant's credibility, crimes such a theft and passing bad checks involve lack of honesty, which do. Plaintiff, furthermore, also has admitted to being involved in shoplifting. See Tr. 250, 272, 316.

Lastly, the ALJ discounted plaintiff's credibility on the basis that she had "reported engaging in activities inconsistent with inability to perform all work-related activities." Tr. 20. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Although, as plaintiff notes, it may be that she is more limited in her ability to perform household or other similar activities due to pain than found by the ALJ, and, as discussed above, the ALJ erred in not providing specific evidence that she had "demonstrated an ability to perform some types of work despite her impairments," the fact that one or more of the reasons for discounting her credibility were improper, does not render the ALJ's credibility determination invalid, as long as that determination is supported by substantial evidence in the record, as it is in this case. Tonapetyan, 242 F.3d at 1148. Accordingly, the

1  ALJ overall did not err in finding plaintiff to be not entirely credible in this case.

2  IV.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

3          If a disability determination "cannot be made on the basis of medical factors alone at step three of

4  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

5  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

6  claimant's residual functional capacity assessment is used at step four to determine whether he or she can

7  do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It

8  thus is what the claimant "can still do despite his or her limitations." Id.

9          A claimant's residual functional capacity is the maximum amount of work the claimant is able to

10  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

11  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

12  those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

13  claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional

14  limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other

15  evidence." Id. at *7.

16          Here, the ALJ assessed plaintiff with the residual functional capacity to "perform a full range of

17  work at all exertional levels," with the further limitations that she be restricted "to work involving simple,

18  repetitive tasks performed at a predictable work pace with only occasional contact with co-workers and no

19  contact with the public." Tr. 17.  Plaintiff argues the ALJ's RFC assessment is flawed, because it did not

20  accommodate his own finding that she had "a tendency to isolate at times." Tr. 16.  Plaintiff, however, has

21  failed to establish the ALJ's restriction to only occasional contact with co-workers and no contact with the

22  public does not adequately account for that tendency.  That is, there is no indication plaintiff has to isolate

23  at a frequency or for a duration greater than the social functioning limitations imposed by the ALJ in this

24  case.  The fact that plaintiff reported staying in bed when depressed must be viewed in light of the adverse

25  credibility determination discussed above, and the report fails to indicate she needs to isolate herself from

26  other people at those times.  As such, the undersigned finds no error here.

27                                          CONCLUSION

28          Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was

not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **May 22, 2009**, as noted in the caption.

DATED this 24th day of April, 2009.

Karen L. Strombom
United States Magistrate Judge